UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SIRVETTA N. BASNETT**,  Case No. 1:10 CV 1995

       Plaintiff,  Magistrate Judge James R. Knepp II

v.  MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

       Defendant.

## Introduction

Plaintiff Sirvetta Basnett, on behalf of her minor child, appeals the administrative denial of supplemental security income (SSI) benefits under 42 U.S.C. § 1383. The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 15). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

## Background

Medical History

Plaintiff filed for Supplemental Security Income (SSI) benefits on September 26, 2003, alleging her child has been disabled since birth. (Tr. 89). Plaintiff's minor child was born on April 16, 2003 (Tr. 89), and was immediately treated for fetal tachycardia. (Tr. 437). Two days later, the child was diagnosed with a moderate patent ductus arteriosus (PDA), a patent foramen ovale, and mild pulmonary hypertension. (Tr. 301). Dr. Mark Sivakoff saw the child in June of 2003 and determined that the PDA had likely closed or was considerably small, having not heard a murmur while examining him. (Tr. 272).

At two months old, the child was seen by Dr. Walter Chwals who noted that his right scrotal sack was substantially bigger than his left. (Tr. 268). However, Dr. Chwals concluded that surgery was not necessary to correct this because such conditions usually resolve naturally through childhood. (Tr. 268). Also as an infant, the child had jaundice and a hernia. (Tr. 193). In addition, the record shows the child has eczema. (Tr. 355, 613).

In 2006, after a behavioral observation, Dr. Dennis Drotar wrote that the child's "behavioral patterns are indicative of a clinically significant behavioral disorder." (Tr. 193). Dr. Drotar noted the child was too young at the time for a formal diagnosis, but said his behaviors were "characteristic of children with ADHD" and will necessitate psychological intervention. (Tr. 193). Shortly thereafter, the child was examined at University Hospital for tonsilitis, whereupon the examining physician wrote on his chart "needs psychiatrist eval? bipolar" and "ADHD . . . needs behavioral meds". (Tr. 218).

In 2008, the child was examined by Dr. Shenandoah Robinson for frequent headaches. (Tr. 304-305). After ordering a CT, Dr. Robinson concluded the child's headaches were not caused by a significant structural problem. (Tr. 305). In a letter to the child's primary care physician, Dr. Robinson said the child "was mildly hyperactive [but] generally well-behaved during the visit." (Tr. 304). Around the same time, the child was hospitalized after Plaintiff brought him to the emergency room at University Hospital for his asthma. (Tr. 350-351). The child had been coughing, sneezing, wheezing, and maintaining a fever for 5 days at home. (Tr. 354). During this hospitalization, the child was given prednisone, albuterol nebulizers, and singulair. (Tr. 352). Later, in April 2008, the child was taken to the emergency room again, this time at Euclid Hospital, for dyspnea, chest pain, and wheezing caused by his asthma. (Tr. 524, 526). While there, he was once again prescribed a

2

steroid, prednisolone, for treatment, but was discharged the same day. (Tr. 527, 531). Also in April 2008, the child fell on his ankle and was seen at University Hospital for it, whereupon the physician noted a rash and itch on his skin, symptoms of his eczema. (Tr. 369).

Between hospitalizations, the child was seen by Dr. Denise Bothe for his behavioral problems. Dr. Bothe wrote in her assessment of the child that he "does qualify for the diagnosis of attention deficit hyperactivity disorder." (Tr. 333). She recommended counseling for Plaintiff to help her with techniques for managing the child's behavioral difficulties. (Tr. 333). However, a few months later, Dr. Bothe essentially retracted her ADHD diagnosis, saying "[The child] may qualify for the diagnosis of [ADHD, but t]ypically, ADHD is a diagnosis given when symptoms cause dysfunction and are pervasive in more than one setting, such as home and school." (Tr. 497). Dr. Bothe therefore wanted the child to begin kindergarten to get input from his teachers about his behavior and learning abilities. (Tr. 497).

Administrative Hearings

On June 10, 2008, Plaintiff appeared with counsel and her minor child before the ALJ. (Tr. 607). The ALJ asked the child a total of seven questions before questioning Plaintiff. (Tr. 607-608). Plaintiff testified that the child is restless, has headaches, and often complains that he cannot breathe due to his asthma. (Tr. 611). Because the medical records were incomplete and contradictory, the hearing was rescheduled and resumed on June 27, 2008. (Tr. 625). Plaintiff then testified that the child had to be taken to the emergency room in the interim because of breathing problems. (Tr. 591). She told the ALJ the child takes singulair at night for his asthma and naproxen for his allergies. (Tr. 613). The child also uses albuterol every four to six hours or as needed. (Tr. 612).

Dr. Arthur Newman testified as a medical expert. (Tr. 622). Dr. Newman was unable to

3

testify to the child's severe impairments because he took issue with the records supplied to him by the child's psychologist. (Tr. 592-593). Furthermore, the medical records were too incomplete as to the child's prescription history for him to conclude whether the child's asthma constituted a severe impairment. (Tr. 593). Nonetheless, Dr. Newman did testify that, based on his observation of the child at the hearing, he could attest to the child's hyperactivity. (Tr. 597).

## Standard of Review

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## Standard for Disability

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). In the case of a claimant under the age of 18, the Commissioner follows a three-step evaluation process -- found at 20 C.F.R. § 416.924(a) -- to determine if a claimant is disabled:

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it is a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine, under step three of the analysis, whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different domains. 20 C.F.R. § 416.926a(b)(1). This approach, called the "whole child" approach, accounts for all the effects of a child's impairments singly and in combination. SSR 09-1P, 2009 WL 396031, at *2. If the impairment results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. 20 C.F.R. § 416.926a(a). A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). The six

5

functionality domains to be assessed are: (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for yourself, and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

## Discussion

Treating Physician Rule

Plaintiff argues the ALJ erred by failing to provide good reasons to ignore or discredit the diagnoses of the child's treating physicians who either made ADHD diagnoses or stated that the child suffers from mental and behavioral problems. An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.927(d). In determining how much weight to afford a particular opinion, an ALJ must consider: 1) examining relationship; 2) treatment relationship – length, frequency, nature and extent; 3) supportability; 4) consistency; and 5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2P, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight it gives a treating physician's opinion. *Id.* Failure

to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409-10 (6th Cir. 2009).

In his opinion, the ALJ noted that because there was no formal ADHD diagnosis, the mental and behavioral issues do not create functional limitations. (Tr. 20-23, 25-26). In other words, without a formal diagnosis, these symptoms are not "medically determinable". 20 C.F.R. § 416.929(b). After review of the record, the Court finds this determination supported by substantial evidence.

Construed liberally, three physicians made some sort of ADHD remarks after observing the child. First, after a behavioral observation, Dr. Drotar concluded the child "demonstrates high levels of oppositional behaviors and impulsive and active behaviors characteristic of children with ADHD", although Dr. Drotar stopped short of formally diagnosing the child because he felt two years and nine months of age was too young for a reliable diagnosis. (Tr. 193). Second, when the child was seen for tonsilitis in February 2006, the attending physician in the emergency room wrote on his chart, "needs psychiatrist eval? bipolar" and "with ADHD . . . needs behavioral meds." (Tr. 218). Third, in April 2008 (two years after being too young for a reliable diagnosis according to Dr. Drotar), Dr. Bothe examined the child and wrote in her assessment: "Severe behavior problems. [The child] does qualify for the diagnosis of attention deficit hyperactivity disorder." (Tr. 333). However, three months after saying this, and after the child underwent further developmental testing, Dr. Bothe scaled back her assessment and refrained from formally diagnosing ADHD: "[The child] may qualify for the diagnosis of attention deficit hyperactivity disorder. Typically, ADHD is a diagnosis given when symptoms cause dysfunction and are pervasive in more than one setting, such as home and school." (Tr. 497).

Thus, the only actual ADHD diagnosis made (and not retracted) appears to have been made

by an emergency room physician who went farther than the two specialists in pediatric psychiatry, Drs. Drotar and Bothe, were comfortable going. The ALJ's opinion is supported by the two opinions of the child's treating specialists in the area. Even if the emergency room physician's opinion starkly contrasted that of Drs. Drotar and Bothe (which it does not), the ALJ's opinion would still be supported by substantial evidence because it adopts the approach taken by the child's two predominant treating specialists.

Severe Impairments

After finding the child has not engaged in substantial gainful activity, the ALJ concluded in step two of the analysis that the child has two severe impairments: eczema and asthma. (Tr. 18). Plaintiff argues it was error to not consider the child's behavioral and mental symptoms as amounting to a severe impairment.

The severity standard at step two of the analysis is a threshold inquiry; as long as the claimant has at least one severe impairment or combination of impairments, the ALJ must proceed beyond step two and consider all impairments at the remaining steps of the evaluation process. 20 C.F.R. § 404.1523. If the ALJ finds at least one severe impairment, the only remaining issue is what limitations, if any, result from the combination of impairments. *See Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) ("When an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does not constitute reversible error.") (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir 1987)).

Here, the ALJ did not consider the child's behavioral abnormalities and developmental delays to be severe impairments, presumably because he found no formal ADHD diagnosis. (Tr. 18).

8

However, because the ALJ found other severe impairments, and continued with the analysis to consider the limitations imposed by all impairments, severe or not, the failure to consider the child's developmental delays and behavioral abnormalities as severe impairments was not reversible error.

Functional Domains

Plaintiff argues the ALJ erred by discounting the child's behavioral abnormalities and developmental delay when considering the limitations of his impairments. During step three, the ALJ concluded that none of the child's impairments or combinations of impairments meets, medically equals, or functionally equals one of the listed impairments. (Tr. 18). In determining functional equivalence, the ALJ found the child to have no limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and ability to care for himself. (Tr. 19-25). The ALJ found the child to have less than marked limitations in the domains of moving about and manipulating objects, and health and physical well-being. (Tr. 23-25).

For the domain of interacting and relating with others, the ALJ based his conclusion of no limitation on several facts: the child has not been actually diagnosed with ADHD, developmental test scores show he has moderately low social skill levels, and the child testified that he plays with other children and gets along with them. (Tr. 23). For this domain, the ALJ did, in fact, consider the child's behavior and developmental delays. As examined above, the finding of no formal ADHD diagnosis is consistent with the opinions of the child's treating specialists. But while the child did testify that he gets along with other children, he also said he sometimes gets into fights with them. (Tr. 608). Plus, there is other evidence in the record showing the child's inability to get along with others. Specifically, Plaintiff testified that the child has to be strapped down for doctor's

appointments because he bites and kicks the doctor. (Tr. 615). Also, Dr. Drotar's report says the child has "difficulty interacting with peers, and can be aggressive (hitting or biting) toward other children", making it "impossible for him to manage in day care." (Tr. 193). This information is inconsistent with the report of Dr. Robinson, who found the child mildly hyperactive but generally well-behaved. (Tr. 304). The evidence for this domain is thus mixed, and the ALJ noted these points before ultimately finding no limitation. (Tr. 23). But because the record includes no formal diagnosis of ADHD, some indication from a physician that the child can be well-behaved, and the child's own testimony that he gets along with other children, there is substantial evidence (more than a scintilla but less than a preponderance) to support the ALJ's conclusion of no limitation in the domain of interacting and relating with others.

Similarly, the ALJ relied heavily on the absence of a formal ADHD diagnosis to conclude that the child has no limitation in the domains of acquiring and using information, ability to care for himself, and attending and completing tasks. (Tr. 20, 21, 25). For these domains, the ALJ also relied on facts such as the child's developmental test scores being in the average range and showing no delay in daily living skills. (Tr. 21, 25). But the ALJ also considered the fact that the child's general development was at a two year ten month level even though he was five years old. (Tr. 20). So once again, the ALJ did actually consider the child's developmental delays in reaching his conclusions. Furthermore, these conclusions are supported by substantial evidence in the record because there was no formal ADHD diagnosis made and because the child's Slossen developmental test showed an average range developmental quotient. (Tr. 373).

The ALJ determined the child has a less than marked limitation in the domain of moving about and manipulating objects. (Tr. 23-24). This conclusion was based on the child's documented

history of mild wheezing and occasional tachycardia, as well as the child's developmental tests showing delays in fine motor skills. (Tr. 24). The child's medical records support this finding. In particular, hospital records from University Hospital and Euclid Hospital have noted wheezing (Tr. 354, 524) and tachycardia (Tr. 437), and Dr. Bothe has documented the child's delays in fine motor skills (Tr. 374). Therefore, the ALJ's conclusion of a less than marked limitation in the domain of moving about and manipulating objects is supported by substantial evidence.

In the final domain considered, health and well-being, the ALJ determined the child has a less than marked limitation. (Tr. 25). The regulations expand on what is necessary to show a marked limitation in the domain of health and well-being:

> For the sixth domain of functioning, "Health and physical well-being," we may also consider you to have a "marked" limitation if you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs . . . [F]requent means that you have episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more[,] more often than 3 times a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect . . . is equivalent in severity.

20 C.F.R. 416.926a(e)(2)(iv).

Using this guidance, the ALJ looked to the documented exacerbations of the child's asthma and eczema, and concluded the occurrences of the child's symptoms were not frequent enough to amount to a marked limitation in the domain of health and physical well-being. (Tr. 25-26). Despite once again noting the lack of a formal ADHD diagnosis, the ALJ nonetheless considered the child's ADHD signs and symptoms displayed when examining this functional domain, as required by 20 C.F.R. § 416. 929a(1).

11

The record indicates exacerbations of the child's asthma twice in the year preceding this litigation. (Tr. 350-358, 520-527). The first of these incidents led to the child being hospitalized for three days (Tr. 361) and the second did not require an overnight stay in the hospital (Tr. 531). Neither exacerbation lasted for two weeks. Similarly, the child was documented to have symptoms of his eczema in 2008 while at the hospital for an ankle injury. (Tr. 369). Including this as an exacerbation of the child's impairments, the fact these exacerbations have happened only three times means short exacerbations have not happened more often than three times a year or once every four months. Because these hospital records show the exacerbations of the child's illnesses do not meet the frequency requirements of 20 C.F.R. § 416.926a(e)(2)(iv), the record supports the ALJ's conclusion that the child has a less than marked limitation in the domain of health and physical well-being.

Credibility

Plaintiff's final argument is that the ALJ erred by discounting Plaintiff's testimony without explaining why he found it not credible. When the claimant is a child under the age of eighteen and cannot adequately describe his or her symptoms, the ALJ is required to accept the testimony of the person most familiar with the child's condition. 20 C.F.R. § 416.928(a). In such a case, "the ALJ must make specific findings concerning the credibility of the parent's testimony, just as he would if the child were testifying." *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001). The failure to make such credibility findings can undermine the Secretary's argument that there is substantial evidence adequate to support the conclusion of no disability. *See Williams on Behalf of Williams v. Bown*, 859 F.2d 255, 261 (2nd Cir. 1988).

Credibility determinations must be "grounded in the evidence and articulated in the

determination or decision." SSR 96-7P, 1996 WL 374186, at *4. "The ALJ may not 'make a single conclusory statement that . . . 'the allegations are (or are not) credible.'" *Saddler v. Commissioner of Social Sec.*, 1999 WL 137621, at *2 (6th Cir.) (quoting SSR 96-7P, 1996 WL 374186, at *1.). If the ALJ rejects testimony as incredible, he must give reasons for doing so. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). "The determination . . . must contain specific reasons for the finding on credibility . . . and must be sufficiently specific to make clear . . . the weight the [ALJ] gave to the individual's statements and the reasons for that weight." SSR 96-7P, 1996 WL 374186, at *2.

Here, Plaintiff testified about the child's impairments after a very brief exchange between the ALJ and the child during which the child gave mostly one-word answers. (Tr. 610, 607-609). The ALJ then made a single, conclusory statement about credibility in his opinion:

> [T]he statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below.

(Tr. 19).

Plaintiff argues the ALJ's failure to state the weight given to Plaintiff's testimony and the reasons therefor resulted in an improper evaluation of the child's impairments and symptoms. But the ALJ did explain his reasons for giving less weight to the child's behavioral problems. Several times in his opinion, the ALJ cited the lack of a formal ADHD diagnosis by the child's treating physicians as a reason for making conclusions about his functionality. (Tr. 20-21, 23, 25-26). Though not stated explicitly, this is enough of an explanation "sufficiently specific to make clear" the weight given by the ALJ to testimony regarding the child's behavioral problems. A treating physician's opinion is given "controlling weight" if supported by medically acceptable techniques

and not inconsistent with substantial evidence in the record. *Rogers*, 486 F.3d at 242. Here, Plaintiff's testimony was not inconsistent with the opinions of Drs. Drotar and Bothe, who both acknowledged the child's behavioral difficulties. (Tr. 193, 333). But a diagnosis is for a treating physician, not a lay person, to make. Consistent with 20 C.F.R. § 416.929(b) and 20 C.F.R. § 404.1508, the ALJ properly relied on the medically determinable evidence in the record to make his conclusions.

## Conclusion

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Commissioner's decision denying benefits is affirmed.

IT IS SO ORDERED.

                                                              s/James R. Knepp II
                                                United States Magistrate Judge